**ORIGINAL**   **VIA FAX**

Keith E. Butler  State Bar Number 200496
Clausen Miller P.C.
2040 Main Street, Suite 500
Irvine, CA 92614
Telephone  (949) 260-3100
Facsimile  (949) 260-3190

Attorneys for Plaintiff, AMERICAN
DIAGNOSTIC MEDICINE, INC.

FILED

2007 DEC 21  PH 2: 30

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____K N W_____DEPUTY

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

AMERICAN DIAGNOSTIC MEDICINE,
INC.,

         Plaintiff,

vs.

ROBERT WALDER, PAUL KAPLAN,
and DOES 1 through 100, inclusive,

         Defendants.

Case No. 07 CV 2401 W CAB

**COMPLAINT; DEMAND FOR
JURY TRIAL**

NOW COMES Plaintiff, American Diagnostic Medicine, Inc., by and

through its attorneys Clausen Miller P.C., for its Complaint against Defendants,

Robert Walder and Paul Kaplan (collectively, "Defendants"), states as follows:

**PARTIES**

1.    American Diagnostic Medicine, Inc. ("ADM") is an Illinois

corporation with its principal place of business in Elmhurst, Illinois.  ADM is in the

business of leasing medical imaging equipment to hospitals and other medical

facilities and providing support technicians, including nuclear, molecular imaging

technologies.

-1-

60413.1

2.    Robert Walder ("Walder") is a resident of California, residing at 15335 Poway Springs Court, Poway, California 92064. Walder was employed by ADM from March 2006 through October 2007, as Vice President of Sales.

3.    Paul Kaplan ("Kaplan") is a resident of California, and resides at 3521 Corte Romero, Carlsbad, California 92009. Kaplan was employed by ADM from May 2006 through December 2007 as a Territory Sales Representative.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) in that this is a civil action where the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5.    Venue is proper in this judicial district under 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

6.    On March 21, 2006, ADM hired Walder as ADM's Vice President of Sales. That same day, Walder executed an agreement titled, Vice President of Sales Agreement. ("VPS Agreement"). (A copy of the VPS Agreement is attached hereto as Exhibit A.)

7.    Pursuant to Paragraph 6 of the VPS Agreement, Walder agreed in pertinent part that:

> **VPS'S RELATIONSHIP & CONDUCT OF BUSINESS:**
> VPS agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

8.    Pursuant to Paragraph 7 of the VPS Agreement, Walder agreed in pertinent part that:

-2-

60413.1

**TERMINATION:** This agreement shall be enforced until canceled. Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail. Upon termination of this agreement the following applies;

\*          \*          \*

a.     Any violation of the terms of this agreement shall be grounds for immediate termination and VPS shall not be eligible for any commissions owed on confirmed or pending contracts.

9.     Pursuant to Paragraph 8 of the VPS Agreement, Walder agreed in pertinent part that:

8.     NON-DISCLOSURE:   WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States.   And, WHEREAS ADM under this agreement wishes to protect this information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information.   NOW THEREFORE,   the   signatories   mutually covenant and agree as follows:

a.     Definition of Proprietary Information. For purposes of this Agreement, the term "Proprietary Information" shall mean all of the information, data and software furnished by ADM to VPS, whether in oral, written, graphic or machine-readable form, which may include by not be limited to names of other entities interested in acquiring an ownership interest in ADM, financial statements,

-3-

60413.1

corporate and stock information , file layouts, marketing strategies, business, product or acquisition plans, current business relationship or strategies and customer lists. "Proprietary Information" shall not include information which: (i) may be publicly disclosed by the party disclosing the information either prior to or subsequent to the receipt of such information by the receiving party; (ii) shall become generally known in the trade through no fault of the receiving party; (iii) may be lawfully disclosed to the receiving party by a third person to this Agreement who has lawfully acquired the Proprietary Information (iv) was independently developed by the receiving party; or (v) is required to be disclosed pursuant to a duly authorized subpoena, court order, or government authority, in which event the receiving party shall provide prompt written notice to the disclosing party prior to such disclosure, so that the disclosing party may seek a protective order or other appropriate remedy.  In any event, the receiving party hereby acknowledges and agrees that, if such party shall seek to disclose, divulge, reveal, report, publish, transfer or use, for any purpose whatsoever, any Proprietary Information, such party shall bear the burden of proving that any such information is subject to one of the exceptions identified herein.

b.    Treatment of Information.

VPS acknowledges that, in and as a result of employment, and/or discussion with ADM's agents, vendors, officers and employees.  VPS shall or may be making use of or acquiring Proprietary

-4-

60413.1

Information. As a material inducement to disclose such Proprietary Information, VPS covenants and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee: (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest. Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

c. Ownership of Information.
VPS covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

d. Injunctive Relief.
VPS understands and agrees that ADM shall suffer irreparable harm in the event of a breach of any obligations under this Agreement and the monetary damages shall be inadequate to compensate ADM for such breach. Accordingly, VPS agrees that, in the event of a reach or threatened breach of any of the provisions of this Agreement, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, ADM shall be entitled to a temporary restraining order, preliminary injunction and permanent

-5-

60413.1

injunction in order to prevent or restrain
any such breach.

10.    Pursuant to Paragraph 9 of the VPS Agreement, Walder agreed in pertinent part that:

> **NOT COMPETE:** For good consideration and as an inducement for ADM to employ VPS, VPS hereby agrees not to directly or indirectly compete with the business of ADM and its successors and assigns during the period of employment and for a period of 1 year following the termination of VPS and notwithstanding the cause or reason for termination. The term "not compete" as used herein shall mean that the VPS shall not own, manage, operate, consult or to be employee in a business substantially similar to or competitive with the present business of ADM or such other business activity in which ADM may substantially engage during the term of employment.

11.    Pursuant to Paragraph 10 of the VPS Agreement, Walder agreed in pertinent part that:

> **SETTLEMENT OF DISPUTES:** . . . The prevailing party in any lawsuit shall recover reasonable attorney fees and cost incurred from each other.

12.    Pursuant to Paragraph 12 of the VPS Agreement, Walder agreed in pertinent part that:

> **CONSTRUCTION OF AGREEMENT:** This agreement shall be construed according to the laws of the state of Illinois.

13.    During the course of Walder's employment at ADM, he became privy to ADM's confidential business, financial and operational information ("Confidential Information").

14.    On May 8, 2006, ADM, on Walder's recommendation, hired Kaplan as an ADM Territory Sales Representative. That same day, Kaplan executed

-6-

60413.1

an agreement titled, Territory Sales Representative Agreement ("TSR Agreement"). The terms of the TSR Agreement are substantially similar as the terms of Walder's VPS Agreement, with identical paragraphs 6, 7, 8, 9, 10 and 12. (A copy of the TSR Agreement is attached hereto as Exhibit B.)

15.    During the course of Kaplan's employment at ADM, he became privy to ADM's Confidential Information.

16.    On October 17, 2007, ADM terminated Walder's employment for poor management style and a subpar sales record.

17.    Despite being terminated in October 2007, Walder continues to refuse to return certain of ADM's property, including a laptop computer, medical software, hardware keys, a presentation projector and multiple ADM sales manuals.

18.    After ADM terminated Walder, it learned that in July 2007, Walder solicited an ADM employee on behalf of a new company, Core Medical Imaging ("CMI"). As part of his solicitation, Walder asked the ADM employee to sign a "Confidentiality and Non-Disclosure Agreement" ("CMI's NDA") and provided the employee with ADM's highly confidential financial information. (A copy of CMI's NDA without ADM's confidential information Walder disclosed to ADM's employee are attached hereto as Exhibit C.)

19.    As CMI's NDA reflects, Walder and Kaplan were working on behalf of CMI while still employed by ADM.

20.    On December 3, 2007, while ADM was reviewing the extent of Defendants' illegal conduct, Kaplan tendered his resignation to ADM.

21.    Defendants began plotting to compete against ADM while still employed by ADM. They have: 1) breached their employment agreements; 2) used ADM's confidential information; and 3) solicited ADM's customers and employees to divert business away from ADM.

60413.1

## COUNT I - BREACH OF CONTRACT - WALDER

22. ADM realleges paragraphs one (1) through twenty-one (21) as though fully set forth herein.

23. Walder was provided valuable consideration in the form of employment with ADM and access to ADM's Confidential Information in exchange for the contractual obligation undertaken by Walder in Exhibit A.

24. The VPS Agreement attached as Exhibit A is valid and enforceable.

25. ADM has performed all of the terms of the Agreement with Walder.

26. Walder has breached the VPS Agreement by: 1) operating CMI, an ADM competitor, while still employed by ADM; 2) misappropriating and disclosing ADM's Confidential Information without ADM's written authorization; 3) competing directly against ADM within a year after ADM terminated his employment; and 4) refusing to return ADM's property.

27. As a direct and proximate result of Walder's breaches of the VPS Agreement, ADM has sustained, and will continue to sustain, severe and irreparable injury and monetary damages to the value of its Confidential Information, customer goodwill, customer loyalty, and competitive advantage, all of which ADM has expended significant time, money, and effort to secure. Unless Walder is restrained and enjoined from further breaches of the VPS Agreement, ADM will continue to suffer severe and irreparable injury for which it has no adequate remedy at law.

## COUNT II - BREACH OF FIDUCIARY DUTY - WALDER

28. ADM realleges paragraphs one (1) through twenty-seven (27) as though fully set forth herein.

29. As an officer of ADM Walder owned, and continues to owe, fiduciary duties to ADM including, without limitation, a fiduciary duty to act at all time with the utmost good faith, loyalty and fair dealing to ADM and to avoid self

60413.1

dealing and acting for his own personal advantage. These fiduciary duties also encompass obligations on Walder not to misappropriate or improperly use ADM's Confidential Information, not to compete unfairly against ADM while employed by ADM, and after his employment, by not competing against ADM and contacting and soliciting ADM's customers and employees within one year of the date of his termination.

30.   While in ADM's employ, Walder breached his fiduciary duties by: 1) failing to use his best efforts on behalf of ADM; 2) forming and working on behalf of CMI; 3) contacting and soliciting ADM's employees and customers on behalf of CMI or another entity; and 4) refusing to return ADM's property.

31.   These breaches of duty of loyalty and fidelity have been willful and malicious and have been carried out with the intent to deprive ADM of its relationships with its employees, customers, its reputation and Confidential Information.

32.   As a direct and proximate result of Walder's breaches of his duty of loyalty and fidelity, ADM has sustained substantial damages.

**COUNT III - MISAPPROPRIATION OF ADM'S CONFIDENTIAL AND PROPRIETARY INFORMATION - WALDER**

33.   ADM realleges paragraphs one (1) through thirty-two (32) as though fully set forth herein.

34.   ADM disclosed certain of its Confidential Information to Walder as part of Walder's employment with ADM, including ADM's financial and operational information. Pursuant to paragraph 8 of the VPS Agreement, Walder acknowledged that such information is proprietary.

35.   ADM took reasonable steps to insure said information remained confidential.

36.   Walder disclosed ADM's Confidential Information to at least one ADM employee, without ADM's knowledge and authority.

-9-

60413.1

37.    Walder has misappropriated ADM's Confidential Information, and has used said information to directly compete against ADM.

38.    Walder's misappropriation of ADM's Confidential Information was willful and malicious.

39.    As a direct and proximate result of Walder's misappropriation of ADM's Confidential Information, ADM has sustained substantial damages.

## COUNT IV - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS - WALDER

40.    ADM realleges paragraphs one (1) through thirty-nine (39) as though fully set forth herein.

41.    ADM has a valid business expectancy to continue its relationships with its customers that were developed through ADM's expenditures of substantial time, money and effort.

42.    As a result of Walder's employment with ADM, Walder had knowledge of these relationships.

43.    Walder has intentionally and unjustifiably interfered with these relationships by illegally: 1) contacting and soliciting ADM customers; 2) using ADM's Confidential Information; 3) defaming and/or disparaging ADM to ADM's customers and employees; and 4) breaching his fiduciary duties to ADM.

44.    Walder's actions are not privileged because he breached the VPS Agreement and his fiduciary duty to ADM in order to solicit customers and employees, by among other things, contacting and soliciting ADM customers and employees while still employed by ADM, and within the one year of the his date of termination.

45.    As a direct and proximate result of Walder's actions, ADM has sustained, and will continue sustain until enjoined, severe and irreparable injury to its customer relationships, goodwill, and loyalty.

-10-

60413.1

**COUNT V - CONVERSION - WALDER**

46.    ADM realleges paragraphs one (1) through forty-five (45) as though fully set forth herein.

47.    At all time, ADM was, and still is, entitled to the immediate and exclusive possession of its personal property, as alleged above, and its Confidential Information, including all physical embodiments thereof.

48.    The continued detention by Walder of ADM's personal property and Confidential Information ADM's constitutes conversion.

49.    Walder conduct as alleged herein has caused and will continue to cause irreparable injury to ADM and entitles it to permanent injunctive relief.

50.    Walder's conduct as set forth and incorporated herein has been willful and malicious.

**COUNT VI - BREACH OF CONTRACT - KAPLAN**

51.    ADM realleges paragraphs one (1) through fifty (50) as though fully set forth herein.Kaplan was provided valuable consideration in the form of employment with ADM and access to ADM's Confidential Information in exchange for the contractual obligation undertaken by Kaplan in Exhibit B.

52.    The TSR Agreement attached as Exhibit B is valid and enforceable.

53.    ADM has performed all of the terms of the Agreement with Kaplan.

54.    Kaplan has breached the TSR Agreement by: 1) operating CMI, an ADM competitor, while still employed by ADM; 2) misappropriating and disclosing ADM's Confidential Information without ADM's written authorization; and 3) competing directly against ADM within a year after he terminated his employment with ADM.

55.    As a direct and proximate result of Kaplan's breaches of the TSR Agreement, ADM has sustained, and will continue to sustain, severe and irreparable

-11-

60413.1

injury to the value of its Confidential Information, customer goodwill, customer loyalty, and competitive advantage, all of which ADM has expended significant time, money, and effort to secure.  Unless Kaplan is restrained and enjoined from further breaches of the TSR Agreement, ADM will continue to suffer severe and irreparable injury for which it has no adequate remedy at law.

## COUNT VII - MISAPPROPRIATION OF ADM'S CONFIDENTIAL AND PROPRIETARY INFORMATION - KAPLAN

56.    ADM realleges paragraphs one (1) through fifty-five (55) as though fully set forth herein.

57.    ADM disclosed certain of its Confidential Information to Kaplan as part of Kaplan's employment with ADM, including ADM's financial and operational information.  Pursuant to paragraph 8 of the TRS Agreement, Kaplan acknowledged that such information is proprietary.

58.    ADM took reasonable steps to insure said information remained confidential.

59.    Kaplan disclosed ADM's Confidential Information to at least one ADM employee, without ADM's knowledge and authority.

60.    Kaplan has misappropriated ADM's Confidential Information, and has used said information to directly compete against ADM.

61.    Kaplan's misappropriation of ADM's Confidential Information was willful and malicious.

62.    As a direct and proximate result of Kaplan's misappropriation of ADM's Confidential Information, ADM has sustained substantial damages.

## COUNT VIII - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS - KAPLAN

63.    ADM realleges paragraphs one (1) through sixty-two (62) as though fully set forth herein.

60413.1

64.    ADM has a valid business expectancy to continue its relationships with its customers that were developed through ADM's expenditures of substantial time, money and effort.

65.    As a result of Kaplan's employment with ADM, Kaplan had knowledge of these relationships.

66.    Kaplan has intentionally and unjustifiably interfered with these relationships by illegally: 1) contacting and soliciting ADM customers; 2) using ADM's Confidential Information; 3) defaming and/or disparaging ADM to ADM's customers and employees; and 4) breaching his fiduciary duties to ADM.

67.    Kaplan's actions are not privileged because he breached his TSR Agreement, by among other things, contacting and soliciting ADM customers and employees while still employed by ADM, and within the one year of the his date of termination.

68.    As a direct and proximate result of Kaplan's actions, ADM has sustained, and will continue sustain until enjoined, severe and irreparable injury to its customer relationships, goodwill, and loyalty.

WHEREFORE, plaintiff American Diagnostic Medicine, Inc. prays that judgment be entered in its favor and against defendant Robert Walder, Paul Kaplan, Brandon Walton and Core Medical Imaging LLC as follows:

a.    Permanent injunction against Defendants and all those acting in concert with them, to enjoin the use of ADM's Confidential Information;

b.    Permanent injunction against Defendants and all those acting in concert with them, to enjoin their defamation and/or disparagement of ADM to ADM's customers and ADM's employees;

c.    Temporary injunction against Defendant from directly or indirectly competing with ADM until one year after their separation/termination from ADM;

d.    An award of damages in an amount to be provided at trial, plus interest thereon;

-13-

60413.1

1        e.     An award of the costs and expenses, including reasonable

2  attorneys' fees, incurred by ADM in connection with this action;

3        f.     The award of punitive damages; and

4        g.    Such other and further relief as the Court deems just and proper.

5        Plaintiff AMERICAN DIAGNOSTIC MEDICINE, INC. hereby

6  demands trial by jury in this action.

7

8  DATED:  December 21, 2007          CLAUSEN MILLER P.C.

9

10                                BY: _____

11                                    Keith E. Butler

12                       Attorneys for Plaintiff, AMERICAN

13                       DIAGNOSTIC MEDICINE, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

60413.1

**EXHIBIT A**

EXHIBIT A



# Vice President of Sales Agreement

This agreement made this 21st day of March, 2006 by and between Bob Walder hereinafter referred to as the Vice President of Sales "**VPS**" and **American Diagnostic Medicine, Inc.,** a corporation under the laws of the State of Illinois, having its office at 960 Industrial Drive, Suite 7, Elmhurst, Illinois 60126, hereinafter referred to as "**ADM**", is as follows:

**1.   APPOINTMENT AND ACCEPTANCE:** ADM appoints VPS as its Vice President of Sales to sell the products and services of ADM in the territories and accounts or customers as set forth below and VPS accepts the appointment and agrees to exclusively sell and promote the sale of ADM's products and services.

**2.   TERRITORY:** VPS's territories and/or accounts shall consist of the following:

> All Hospitals, Multi-Specialty Clinics, Cardiology Practices and other Health Care Providers in the following geographic locations;
>
> Western Territory including Washington, Oregon, California, Arizona, Nevada.

**3.   COMPENSATION:** VPS compensation for services performed under the terms of this agreement shall be for the sale of certain medical diagnostic imaging equipment, whether through operating leases, joint ventures, traditional capital leases or outright purchases or other types of services supplied under the terms of this agreement. Please refer to **EXHIBIT A** for detailed information concerning compensation.

    **a.**   It is the responsibility of the VPS to obtain advanced authorization from ADM on all special circumstances involving compensation not covered by this Agreement.   Any special arrangements, which are agreed upon, by ADM and the VPS must be communicated in writing.
    **b.**   Sales efforts and in turn commissions due on all new accounts will be governed by the territories applicable to this agreement if the decision making / buying power resides within the territory for each specific customer and/or account.
    **c.**   The commission shall be paid to the VPS based on the schedule shown in **EXHIBIT A.** Commission checks shall be paid on a 1099 form to VPS.
    **d.**   ADM shall pay for or reimburse VPS for all travel costs relating to obtaining business under the terms of this Agreement. Such travel costs may include, transportation (airfare, rental cars), mileage reimbursement, lodging, entertainment, phone calls, etc.). VPS shall provide to ADM at its principal office detailed expense reports on ADM expense report forms.  Each expense report shall detail the reason for travel and well as who was visited.   Expense reports turned in after thirty (30) days shall not be eligible for reimbursement.   All travel arrangements and costs must comply with ADM travel policies and be pre-approved by ADM.

**4.   ACCEPTANCE OF CONTRACTS:** All contracts are subject to acceptance or rejection by an authorized officer of ADM.  ADM shall be responsible for all credit risks and collections.  If ADM notifies customer of its acceptance or rejection of any contact, a copy shall be transmitted to the VPS.

**5.   TERMS OF SALE:** ADM shall provide VPS with a current price schedule / quotation, which shall be subject to change upon ninety (90) days notice.   Representative may quote to prospective customers from this price list provided but no quote shall be valid for more than ninety (90) days.  All other sales shall be at prices and upon terms established by ADM.  ADM shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend prices and other terms and conditions of sale. VPS shall not accept orders in ADM's name and shall not make price quotations or delivery promises for items not specifically on the current price



Exhibit A, Page 1

information, file layouts, marketing strategies, business, product or acquisition plans, current business relationships or strategies and customer lists. "Proprietary Information" shall not include information which: (i) may be publicly disclosed by the party disclosing the information either prior to or subsequent to the receipt of such information by the receiving party; (ii) shall become generally known in the trade through no fault of the receiving party; (iii) may be lawfully disclosed to the receiving party by a third person to this Agreement who has lawfully acquired the Proprietary Information (iv) was independently developed by the receiving party; or (v) is required to be disclosed pursuant to a duly authorized subpoena, court order, or government authority, in which event the receiving party shall provide prompt written notice to the disclosing party prior to such disclosure, so that the disclosing party may seek a protective order or other appropriate remedy. In any event, the receiving party hereby acknowledges and agrees that, if such party shall seek to disclose, divulge, reveal, report, publish, transfer or use, for any purpose whatsoever, any Proprietary Information, such party shall bear the burden of proving that any such information is subject to one of the exceptions identified herein.

   **b.**   Treatment of Information.

VPS acknowledges that, in and as a result of employment, and/or discussions with ADM's agents, vendors, officers and employees, VPS shall or may be making use of or acquiring Proprietary Information. As a material inducement to disclose such Proprietary Information, VPS covenants and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee: (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest. Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

   **c.**   Ownership of Information.

VPS covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

   **d.**   Injunctive Relief.

VPS understands and agrees that ADM shall suffer irreparable harm in the event of a breach of any obligations under this Agreement and the monetary damages shall be inadequate to compensate ADM for such breach. Accordingly, VPS agrees that, in the event of a breach or threatened breach of any of the provisions of this Agreement, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, ADM shall be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach.

   **e.**   Materials.

All notes, data, tapes, reference items, sketches, drawings, memoranda, manuals, documentation, records and other materials in any way relating to any of the Proprietary Information or to ADM's business shall belong exclusively to ADM and VPS to turn over all copies of such materials and any Proprietary Information in the VPS's possession or control at the request of ADM.

   **f.**   Nature of the Information.

Although the Proprietary Information contains information which is relevant for day-to-day operation of the company, ADM makes no representations or warranties, express or implied, as to the accuracy or completeness of the Proprietary Information. ADM shall not have any liability to the other party relating to or arising from the use of the Proprietary Information according to the terms of this Agreement. Neither party represents or warrants that Proprietary Information disclosed hereunder will not infringe any third party's patents, copyrights, trade secrets or other proprietary rights of others.

   **g.**   Reasonableness of Restrictions; Severability.

EACH PARTY HAS CAREFULLY READ AND CONSIDERED THE PROVISIONS OF THIS SECTION HEREOF INCLUSIVE AND, HAVING DONE SO, AGREES THAT THE RESTRICTIONS SET FORTH IN SUCH ARTICLES ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF THE PARTIES AND ITS BUSINESS, OFFICERS, DIRECTORS

list, without ADM's approval.

**6.    VPS'S RELATIONSHIP & CONDUCT OF BUSINESS:** VPS shall maintain its own sales organization within its assigned territories and shall use its best efforts and devote such time as may be necessary to sell and promote the sale of ADM's products and services and perform reasonable after-sale and follow-up functions as well as a liaison between ADM and customers within the territory. VPS agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

**a.**    Specific obligations of the VPS will include: Sales Lead Generation, Phone Solicitation, Written Sales Quotations, Contracts and Contract Negotiations, Sales Presentations, Trade Show Attendance and follow-up to potential customers.

**b.**    Any sales lead generated by VPS must immediately (within twenty-four hours) be conveyed via e-mail to the Sales Administrator. Follow-up calls, correspondences or sales quotes by the VPS must immediately (within twenty-four hours) conveyed via e-mail to the Sales Administrator. Weekly activity reports must be e-mailed no latter than 4:00 PM CST every Friday (No exception for holidays). Monthly forecast and outlooks must be e-mailed no later than 4:00 PM CST on the last business day of every month (No exception for holidays).

**c.**    VPS shall conduct all of his business in a professional manner in ADM's name and dress professionally and well groomed.

**d.**    The VPS shall not, without ADM's prior approval, alter, enlarge, or limit orders, make representations, guarantees concerning ADM's product and services or accept the return of, or make any allowances for such products and services whether written or orally.

**7.    TERMINATION:** This agreement shall be enforce until canceled. Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail. Upon termination of this agreement the following applies;

**a.**    Any violation of the terms of this agreement shall be grounds for immediate termination and VPS shall not be eligible for any commissions owed on confirmed or pending contracts.

**b.**    If VPS elects to terminate this agreement and is not in violation of any of the terms of this agreement, ADM will compensate VPS for signed contracts not yet accepted at our own discretion. Electing to terminate this agreement, does not obligate ADM to make any further commission payments.

**c.**    If ADM terminates this agreement and VPS is not in violation of this agreement ADM will compensate the VPS at a rate which is mutually acceptable, but under no circumstance not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to VPS. Commissions will be paid no later than 30 days after the Delivery and Acceptance date. Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions. Commissions on all future contract renewals will not apply.

**8.    NON-DISCLOSURE:** WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States. And, WHEREAS ADM under this agreement wishes to protect this information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information. NOW THEREFORE, the signatories mutually covenant and agree as follows:

**a.**    Definition of Proprietary Information.
For purposes of this Agreement, the term "Proprietary Information" shall mean all of the information, data and software furnished by ADM to VPS, whether in oral, written, graphic or machine-readable form, which may include but not be limited to names of other entities interested in acquiring an ownership interest in ADM, financial statements, corporate and stock

AND EMPLOYEES. Each party further agrees that the restrictions set forth in this Agreement shall not impair either party's ability to do business within field or fields of its choice including, without limitation, those areas in which such party is, to be or has done business. The provisions of this Agreement shall be deemed severable, and invalidity or unenforceability of any one or more of the provisions hereof shall not affect the validity and enforceability of the other provisions hereof.

**9.    NOT COMPETE:** For good consideration and as an inducement for ADM to employ VPS, VPS hereby agrees not to directly or indirectly compete with the business of ADM and its successors and assigns during the period of employment and for a period of 1 year following the termination of VPS and notwithstanding the cause or reason for termination. The term "not compete" as used herein shall mean that the VPS shall not own, manage, operate, consult or to be employee in a business substantially similar to or competitive with the present business of ADM or such other business activity in which ADM may substantially engage during the term of employment.

**10.    SETTLEMENT OF DISPUTES:** The parties agree that any disputes or questions arising hereunder including the construction or application of this agreement may be settled by arbitration in accordance with the rules of the American Arbitration Association then enforce. The American Arbitration Association shall name a panel of five arbitrators and ADM shall then strike two names and the remaining names shall be the arbitrator. The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact and shall not be appealable to any court in any jurisdiction. Both parties shall share the expenses of the arbitrator equally unless the arbitrator determines that the expenses shall be otherwise assessed. The prevailing party in any lawsuit shall recover reasonable attorney fees and costs incurred from each other.

**11.    GENERAL:** This agreement contains the entire understanding of the parties, and shall supersede any other oral or written agreement and shall insure to the benefit of ADM or any of its successors and assigns. This agreement may not be modified in any way without consent of both parties. Nothing in the agreement shall be construed to constitute the VPS as the partner of ADM nor shall either party have any authority to bind the other in any respect; it being intended that each shall remain an independent contractor responsible for only its own actions.

**12.    CONSTRUCTION OF AGREEMENT:** This agreement shall be construed according to the laws of the state of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first written in multiple counterparts, each of which shall be considered an original.

ADM:                                                        *VPS: Vice President of Sales*

**American Diagnostic Medicine, Inc.**

                                                            _____

Printed Name:_____          Signature:_____

Signature:_____

Title:_____

# EXHIBIT A
*Compensation & Commission Rates*

**VPS Compensation:**
ADM shall pay VPS a base annually salary of $132,000.00 to be paid bi-monthly on the 1st and 15th of each calendar month.

**Employee Benefits:**
- Health Insurance & Drug Prescription
- Dental Insurance
- Retirement Fund – Company 401(k), non-matching
- Short Term & Long-Term Disability
- Life Insurance
  (Please contact Janet Hausenbauer at 800.262.9645, ext. 109 for additional details of benefits & cost)

**Paid Vacation:**
- Two (2) weeks paid vacation after the first 12 months of employment
- Three (3) weeks paid vacation after 5 years of employment
- Four (4) weeks paid vacation after 10 years of employment
- Paid Holidays including New Years Day, Memorial Day, Labor Day, July 4th, Thanksgiving Day and Christmas Day.
- Each Employee receives 3 sick days and 2 personal days per year

**Other Incentives:**
- Car allowance of $500.00 monthly to be paid bi-monthly on the same schedule as VPS compensation listed above.

### Fee- per-Exam Operating Leases
### Fixed Site Commission Schedule

**Commissions paid on new nuclear fixed site accounts:**

| | |
|---|---|
| 60 month contract w/ minimums | 10,000 |
| 48 month contract w/ minimums | 8,000 |
| 36 month contract w/ minimums | 6,000 |
| 24 month contract | 4,000 |
| 12 month contract | 2,000 |

**Commissions paid on new 64 slice CT fixed site accounts (50% until September 30, 2006, 100% thereafter):**

| | |
|---|---|
| 60 month contract w/ minimums | 15,000 |
| 48 month contract w/ minimums | 12,000 |

**Commissions paid to vice president of sales on fixed site contract by sales rep (paid upon D&A):**

| | |
|---|---|
| 60 month w/minimums | 1,000 |
| 48 month w/ minimums | 800 |
| 36 month contract | 600 |
| 24 month contract | 400 |
| 12 month contract | 200 |

Page 5 of 7

Exhibit A, Page 5

# EXHIBIT A
## Compensation & Commission Rates

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.

The commissions will be paid to the TSR based on the following payment schedule:
- 25% paid upon signed contract and credit approval
- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.
- 25% paid in the pay period after 2 full scanning months and based on the following criteria
    1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
    2. Patient volume at 75-99% will receive 75% of back end commission
    3. Patient volume at 100-124% will receive the full back end commission
    4. Patient volume 125- 150% will receive 125% of back end commission
    5. Patient volume at >150% will receive 150% of back end commission

### Fee- per-Exam Operating Leases
### Mobile Commission Schedule

**Commissions paid on new mobile accounts:**

| | |
|---|---|
| 12 month contract w/ 4 days/month | 4,000 |
| 12 month contract w/ 3 days/month | 3,200 |
| 12 month contract w/ 2 days/month | 2,000 |
| 12 month contract w/ 1 day/month | 800 |

**Commissions paid to vice president of sales on new mobile contract by sales rep (paid upon D&A):**

| | |
|---|---|
| 12 month contract w/ 4 days/month | 500 |
| 12 month contract w/ 3 days/month | 375 |
| 12 month contract w/ 2 days/month | 250 |
| 12 month contract w/ 1 day/month | 125 |

**Commissions paid on renewed mobile accounts:**

| | |
|---|---|
| 12 month contract w/ 4 days/month | 2,000 |
| 12 month contract w/ 3 days/month | 1,600 |
| 12 month contract w/ 2 days/month | 1,000 |
| 12 month contract w/ 1 day/month | 400 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.

The commissions will be paid to the TSR based on the following payment schedule:
- 50% paid upon signed signed contract and credit approval

· 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the VPS.*

**AGREED AND ACCEPTED:**

ADM

Signature:_____

**AGREED AND ACCEPTED:**

VPS          Bob Walder

Signature:_____

Page 7 of 7

Exhibit A, Page 7

**EXHIBIT B**

EXHIBIT B

Paul Kaplan

# Territory Sales Representative Agreement

This agreement made this 8th day of May, 2006 by and between Paul Kaplan hereinafter referred to as the Territory Sales Representative "**TSR**" and **American Diagnostic Medicine, Inc.**, a corporation under the laws of the State of Illinois, having its office at 960 Industrial Drive, Suite 7, Elmhurst, Illinois 60126, hereinafter referred to as "**ADM**", is as follows:

**1.    APPOINTMENT AND ACCEPTANCE:** ADM appoints TSR as its Territory Sales Representative to sell the products and services of ADM in the territories and accounts or customers as set forth below and TSR accepts the appointment and agrees to exclusively sell and promote the sale of ADM's products and services.

**2.    TERRITORY:** TSR's territories and/or accounts shall consist of the following:

All Hospitals, Multi-Specialty Clinics, Cardiology Practices and other Health Care Providers in the following geographic locations;

California

**3.    COMPENSATION:** TSR compensation for services performed under the terms of this agreement shall be for the sale of certain medical diagnostic imaging equipment, whether through operating leases, joint ventures, traditional capital leases or outright purchases or other types of services supplied under the terms of this agreement. Please refer to **EXHIBIT A** for detailed information concerning compensation.

a.    It is the responsibility of the TSR to obtain advanced authorization from ADM on all special circumstances involving compensation not covered by this agreement. Any special arrangements, which are agreed upon, by ADM and the TSR must be communicated in writing.

b.    Sales efforts and in turn commissions due on all new accounts will be governed by the territories applicable to this agreement if the decision making / buying power resides within the territory for each specific customer and/or account.

c.    The commission shall be paid to the TSR based on the schedule shown in **EXHIBIT A.** Commission checks shall be paid on a 1099 form to TSR.

d.    ADM shall pay for or reimburse TSR for all travel costs relating to obtaining business under the terms of this Agreement. Such travel costs may include, transportation (airfare, rental cars), mileage reimbursement, lodging, entertainment, phone calls, etc.). TSR shall provide to ADM at its principal office detailed expense reports on ADM expense report forms. Each expense report shall detail the reason for travel and well as who was visited. Expense reports turned in after thirty (30) days shall not be eligible for reimbursement. All travel arrangements and costs must comply with ADM travel policies and be pre-approved by ADM.

**4.    ACCEPTANCE OF CONTRACTS:** All contracts are subject to acceptance or rejection by an authorized officer of ADM. ADM shall be responsible for all credit risks and collections. If ADM notifies customer of its acceptance or rejection of any contact, a copy shall be transmitted to the TSR.

**5.    TERMS OF SALE:** ADM shall provide TSR with a current price schedule / quotation, which shall be subject to change upon ninety (90) days notice. Representative may quote to prospective customers from this price list provided but no quote shall be valid for more than ninety (90) days. All other sales shall be at prices and upon terms established by ADM. ADM shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend prices and other terms and conditions of sale. TSR shall not accept orders in ADM's name and shall not make price quotations or delivery promises for items not specifically on the current price

Page 1 of 5



EXHIBIT
B

Exhibit B, Page 8

list, without ADM's approval.

**6.    TSR'S RELATIONSHIP & CONDUCT OF BUSINESS:** TSR shall maintain its own sales organization within its assigned territories and shall use its best efforts and devote such time as may be necessary to sell and promote the sale of ADM's products and services and perform reasonable after-sale and follow-up functions as well as a liaison between ADM and customers within the territory. TSR agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

    **a.**    Specific obligations of the TSR will include: Sales Lead Generation, Phone Solicitation, Written Sales Quotations, Contracts and Contract Negotiations, Sales Presentations, Trade Show Attendance and follow-up to potential customers.

    **b.**    Any sales lead generated by TSR must immediately (within twenty-four hours) be conveyed via e-mail to the Sales Administrator. Follow-up calls, correspondences or sales quotes by the TSR must immediately (within twenty-four hours) conveyed via e-mail to the Sales Administrator. Weekly activity reports must be e-mailed no later than 4:00 PM CST every Friday (No exception for holidays).   Monthly forecast and outlooks must be e-mailed no later than 4:00 PM CST on the last business day of every month (No exception for holidays).

    **c.**    TSR shall conduct all of his business in a professional manner in ADM's name and dress professionally and well groomed.

    **d.**    The TSR shall not, without ADM's prior approval, alter, enlarge, or limit orders, make representations, guarantees concerning ADM's product and services or accept the return of, or make any allowances for such products and services whether written or orally.

**7.    TERMINATION:**  This agreement shall be enforce until canceled. Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail.  Upon termination of this agreement the following applies:

    **a.**    Any violation of the terms of this agreement shall be grounds for immediate termination and TSR shall not be eligible for any commissions owed on confirmed or pending contracts.

    **b.**    If TSR elects to terminate this agreement and is not in violation of any of the terms of this agreement, ADM will compensate TSR for signed contracts not yet accepted at our own discretion. Electing to terminate this agreement, does not obligate ADM to make any further commission payments.

    **c.**    If ADM terminates this agreement and TSR is not in violation of this agreement ADM will compensate the TSR at a rate which is mutually acceptable, but under no circumstance not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to TSR.  Commissions will be paid no later than 30 days after the Delivery and Acceptance date. Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions. Commissions on all future contract renewals will not apply.

**8.    NON-DISCLOSURE:** WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States. And, WHEREAS ADM under this agreement wishes to protect this Information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information. NOW THEREFORE, the signatories mutually covenant and agree as follows:

    **b.**    Treatment of Information.
TSR acknowledges that, in and as a result of employment, and/or discussions with ADM's agents, vendors, officers and employees, TSR shall or may be making use of or acquiring Proprietary Information. As a material inducement to disclose such Proprietary Information, TSR covenants

and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee: (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest. Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

    c.   Ownership of Information.

TSR covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

**9.   SETTLEMENT OF DISPUTES:** The parties agree that any disputes or questions arising hereunder including the construction or application of this agreement may be settled by arbitration in accordance with the rules of the American Arbitration Association then enforce. The American Arbitration Association shall name a panel of five arbitrators and ADM shall then strike two names and the remaining names shall be the arbitrator. The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact and shall not be appealable to any court in any jurisdiction. Both parties shall share the expenses of the arbitrator equally unless the arbitrator determines that the expenses shall be otherwise assessed. The prevailing party in any lawsuit shall recover reasonable attorney fees and costs incurred from each other.

**10.   LEGAL INVOLVING PRIOR EMPLOYER:** The parties agree that any disputes, questions, concerns and legal actions arising from Paul Kaplan joining ADM (American Diagnostic Medicine) as a TSR (Territory Sales Representative) regarding non disclosure, hiring of TSR or any legal dispute pertaining to relationship with TSR as an ADM employee involving relationship with former employer Digirad Corporation and it's subsidiaries Digirad Imaging Solutions, known as hybrid sales person (Territory Manager / Imaging Solutions Expert) American Diagnostic Medicine agrees to completely and fully cover all legal and financial responsibilities for Paul Kaplan.

**11.   GENERAL:** This agreement contains the entire understanding of the parties, and shall supersede any other oral or written agreement and shall insure to the benefit of ADM or any of its successors and assigns. This agreement may not be modified in any way without consent of both parties. Nothing in the agreement shall be construed to constitute the TSR as the partner of ADM nor shall either party have any authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for only its own actions.

**12.   CONSTRUCTION OF AGREEMENT:** This agreement shall be construed according to the laws of the state of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first written in multiple counterparts, each of which shall be considered an original.

ADM:

**American Diagnostic Medicine, Inc.**

Printed Name: _____

Signature: _____

Title:    _____

TSR: *Territory Sales Representative*

PAUL KAPLAN

Signature: *Paul Kaplan* 5-8-06

Exhibit B, Page 10

# EXHIBIT A
*Compensation & Commission Rates*

**TSR Compensation:**
ADM shall pay TSR a base annually salary of $95,000.00 to be paid bi-monthly on the 1st and 15th of each calendar month.

**Employee Benefits:**
- Health Insurance & Drug Prescription begins June 12, 2006
- Dental Insurance begins June 12, 2006
- Retirement Fund - Company 401(k), non-matching begins June 12, 2006
- Short Term & Long-Term Disability begins June 12, 2006
- Life Insurance begins June 12, 2006)
  (Please contact Janet Hausenbauer at 800 262 9645, ext. 109 for additional details of benefits & cost)

**Paid Vacation:**
- Three (3) weeks paid vacation after the first 6 months of employment
- Four (4) weeks paid vacation after 5 years of employment
- Paid Holidays including New Years Day, Memorial Day, Labor Day, July 4th, Thanksgiving Day and Christmas Day.
- Each Employee receives 3 sick days and 2 personal days per year

**Other Incentives:**
- Car allowance is $500.00 monthly beginning June 12, 2006 and covers all fuel while using the car for all business use of vehicle. Car Allowance to be paid bi-monthly on the same schedule as TSR compensation listed above.

### Fee- per-Exam Operating Leases
### Fixed Site Commission Schedule

**Commissions paid on new nuclear fixed site accounts:**

| | |
|---|---|
| • 60 month contract w/ minimums | 9,000 |
| • 48 month contract w/ minimums | 7,200 |
| • 36 month contract w/ minimums | 5,400 |
| • 24 month contract | 3,600 |
| • 12 month contract | 1,800 |

**Commissions paid on new 64 slice CT fixed site accounts (50% until September 30, 2006, 100% thereafter):**

| | |
|---|---|
| • 60 month contract w/ minimums | 15,000 |
| • 48 month contract w/ minimums | 12,000 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
- 25% paid upon signed contract and credit approval
- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

Page 4 of 5

May 08 06 11:43a     Paul Kaplan             9258750685             p.6

# EXHIBIT A

*Compensation & Commission Rates*

· 25% paid in the pay period after 2 full scanning months and based on the following criteria
1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
2. Patient volume at 75-99% will receive 75% of back end commission
3. Patient volume at 100-124% will receive the full back end commission
4. Patient volume 125-150% will receive 125% of back end commission
5. Patient volume at >150% will receive 150% of back end commission

### Fee-per-Exam Operating Leases
### Mobile Commission Schedule

**Commissions paid on new mobile accounts:**

| | |
|---|---|
| 12 month contract w/ 4 days/month | 4,000 |
| 12 month contract w/ 3 days/month | 3,200 |
| 12 month contract w/ 2 days/month | 2,000 |
| 12 month contract w/ 1 day/month | 800 |

**Commissions paid on renewed mobile accounts:**

| | |
|---|---|
| 12 month contract w/ 4 days/month | 2,000 |
| 12 month contract w/ 3 days/month | 1,600 |
| 12 month contract w/ 2 days/month | 1,000 |
| 12 month contract w/ 1 day/month | 400 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
· 50% paid upon signed signed contract and credit approval
  50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the TSR.*

**AGREED AND ACCEPTED:**                    **AGREED AND ACCEPTED:**

ADM                                         TSR        Paul Kaplan

Signature: _____                 Signature: _Paul Kap_ 5-8-06

Page 5 of 5

Exhibit B, Page 12

**EXHIBIT C**

EXHIBIT C



# CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement is entered into as of July 23, 2007 (this "Agreement") between Michele Draper, an individual with an address of

_____, _____, and Brandon Walton, Paul Kaplan and Robert Walder dba Core Medical Imaging ("Company") with an address of Corona, CA.

## RECITALS:

1. Company has certain propriety or confidential information and know-how, including, but not limited to, information or know-hoe relating to nuclear molecular imaging technologies and services.
2. Solely for purposes of enabling the Recipient to understand the nature of the Company and explore the possibility of entering into a business arrangement with the Company (the "Purpose"), Company may disclose to the Recipient certain Information on the terms and conditions set forth in this Agreement,
3. Company and the Recipient consider their relationship on of confidence with respect to Information and agree that Information constitutes valuable trade secrets or other intellectual property rights belonging to Company.

Accordingly, the parties agree as follows:

1. The Recipient hereby agrees as follows:
   a. To hold information in strict confidence, to exercise appropriate caution to maintain its secrecy and to prevent unauthorized use of Information and not to disclose, discuss, communicate or transmit information to others (including, without limitations, to any person other than those persons necessary to accomplish the Purpose and then only so long as such persons are bound by confidentiality and non disclosure agreements comparable to the terms of this Agreement, copies of which shall be provided by Company.
   b. To use Information solely for the Purpose and not to use the Information for any other purpose, including without limitation for the purpose of deriving any commercial or other benefit or advantage.
2. The Obligation of the Recipient to maintain the confidentiality of Information shall not apply to any of the Information that the Recipient can reasonably demonstrate by written record was independently known to or developed by the Recipient prior to and independent of the disclosure of Information by the Company to the Recipient or is or has become publicly known through no fault of the Recipient.
3. The Recipient will promptly return to Company all Information supplied in documentary or in computer form or in any other form and any copies thereof, within three (3) days of a written request of Company or upon completion of the Purpose, and destroy any and all other information, notes, documents, test results or other materials produced by Company or Recipient based upon the Information or otherwise in connection with the Purpose.
4. If Recipient or any of its employees, agents or subcontractors conceives, develops or reduces to practice any modification, improvement, alteration, technology, idea, concept, invention, discovery or design as a result of receipt of Information or the evaluation thereof ("Developments"), such Developments shall constitute the sole property of

Core Medical Imaging – Confidentiality and Non-Disclosure



EXHIBIT

C

Exhibit C, Page 13

Company. Should Company elect to file a patient application for such Development or to otherwise seek protection, Recipient (and will cause each person or entity employed by or engaged by or acting on behalf of Recipient to execute) any document necessary to enable Company to do so, including, but not limited to , declarations, powers of attorney and assignments.

5. Recipient acknowledges that any violation of this Agreement will cause Company immediate and irreparable harm which money damages cannot adequately remedy and further agrees that upon any actual or threatened violation of this Agreement, Recipient consents to the issuance by any court of competent jurisdiction of a restraining order or other injunction, without bond, restraining or enjoining such violations by Recipient or any entity or person acting in concert with Recipient. Recipient understands that such relief is additional to and does not limit the availability to Company of any other remedy.

6. The Recipient's obligations and duties to this Agreement shall be effective and binding during the performance by Recipient of any services (if any) and until such Information is in the public domain through no fault of the Recipient. Notwithstanding the foregoing, there shall be no time limit on the Recipient's obligation to refrain fro using any Information in violation of the terms on this Agreement.

7. This Agreement constitutes the entire Agreement between the parties concerning the confidentiality and non-disclosure of Information and may only be modified in a written agreement signed by both parties. The terms and provisions hereof shall be for the benefit of the parties and their successors and assigns.

8. This agreement does not create any legally binding obligations except for the obligations with respect to the Information set forth in this Agreement. Nothing in this Agreement shall be construed as granting or conferring any rights by license or otherwise in any intellectual property included within the Information. This Agreement shall not constitute or establish any relationship among the parties other than that of independent contractors, and none of the parties shall hold themselves out as, ort otherwise represent that it is, the agent, principal or partner of the other.

9. This Agreement shall be governed by and construes and enforced in accordance with the internal laws of the State of California and the parties irrevocably and unconditionally consent to submit to the jurisdiction of the courts of that State to the federal courts located therein, for any action, suit, or proceeding arising out of or relating to this Agreement. Any written notice to be given to Company hereunder shall be sent directly to Company at the address set forth above, attention of Robert Walder, PA-C, PA-CV.

IN WITNESS WEHEREOF, the undersigned parties have executed and delivered this Agreement effective as of the date first above written:

CORE MEDICAL IMAGING

By: _____

Robert Walder, PA-C, PA-CV

Recipient:

By: _____

Michele Draper

# AMERICAN DIAGNOSTIC MEDICINE, INC.

## CONFIDENTIAL DOCUMENTATION

## REDACTED

**ORIGINAL ● VIA FAX**

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

AMERICAN DIAGNOSTIC MEDICINE, INC.

## DEFENDANTS

ROBERT WALDER, PAUL KAPLAN, and DOES 1 through 100, inclusive

2007 DEC 21   PM 2:33

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   DuPage
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Clausen Miller P.C.
2040 Main Street
Suite 500
Irvine, CA 92614
949-260-3100

ATTORNEYS (IF KNOWN)

'07 CV 2401 W CAB

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Breach of Contract; Breach of Fiduciary Duty; Misappropriation of ADM's Confidential and Proprietary Information; Tortious Interference with Contractual Relationships; Conversion

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☒ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Conditions | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removal from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 0.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   Docket Number _____

DATE   December 21, 2007

SIGNATURE OF ATTORNEY OF RECORD   _Keith Buel_

PAID $350  12/21/07  BY   RECEIPT # 145830

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 145830    — BH
* * C O P Y * *
December 21, 2007
14:36:58**

**Civ Fil Non-Pris**
USAO #.: 07CV2401 CIVIL FILING
Judge..: THOMAS J WHELAN
Amount.:
Check#.: BC# FF50848                $350.00 CK

**Total—>    $350.00**

FROM: CIVIL FILING
        AMERICAN DIAGNOSTIC V. WALDER