1  | Phillip L. Kossy, State Bar No. 71543
2  | Micah Parzen, State Bar No. 222559
   | Liseanne R. Kelly, State Bar No. 211782
   | LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  | 600 West Broadway, Suite 2600
   | San Diego, California 92101-3372
4  | Telephone No.: 619.236.1414
   | Fax No.: 619.232.8311
5
   | Attorneys for Defendant/Counter
6  | Claimant ROBERT WALDER

7

8  |              UNITED STATES DISTRICT COURT

9  |            SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 AMERICAN DIAGNOSTIC MEDICINE, INC., | Case No. 07cv2401 W (CAB) |
| 12      Plaintiff, | JUDGE: Hon. Thomas J. Whelan<br>CTRM: 7 |
| 13 v. | **COUNTERCLAIM BY ROBERT WALDER FOR** |
| 14 ROBERT WALDER, | 1.   **Breach of Contract;** |
| 15 PAUL KAPLAN, and<br>DOES 1 through 100, Inclusive, | 2.   **Breach of Implied Covenant of Good Faith and Fair Dealing;** |
| 16      Defendants. | 3.   **Accounting;**<br>4.   **Wrongful Termination in Violation of Public Policy;** |
| 17 | 5.   **Fraud – Misrepresentation;** |
| 18 PAUL KAPLAN, and<br>ROBERT WALDER, | 6.   **Defamation;**<br>7.   **Violation of Labor Code § 226(a);** |
| 19      Counter Claimants, | 8.   **Violation of Labor Code § 96(k) and 98.6; and** |
| 20 v. | 9.   **Violation of Labor Code § 432.5** |
| 21 AMERICAN DIAGNOSTIC MEDICINE, INC. | **DEMAND FOR JURY TRIAL** |
| 22      Counter Defendant. | |
| 23 | |

24  | ///

25  | ///

26  | ///

27

28

1         Counterclaimant Robert Walder ("Counterclaimant" or "Walder") asserts his Counterclaim

2 against Counterdefendant American Diagnostic Medicine, Inc. ("ADM") as follows:

### GENERAL ALLEGATIONS

4      1.       Counterclaimant Walder is, and at all times mentioned in this counterclaim was, a

5 resident of the city of Poway, county of San Diego, state of California.

6      2.       Walder is informed and believes and on that basis alleges that Counterdefendant ADM

7 is, and at all times mentioned in this complaint was, an Illinois corporation with its principal place of

8 business in Elmhurst, Illinois.

### FACTUAL BACKGROUND

10      3.       On March 21, 2006, ADM hired Walder as its Vice President of Sales. Walder and

11 ADM entered into a Sales Agreement ("VPS Agreement"). A copy of the contract is attached hereto

12 as Exhibit "A".

13      4.       ADM, through its President and CEO Sam Kancherlapalli, represented to Walder that it

14 was hiring him because it wanted to improve its sales of nuclear fixed sites, expand its sales in its

15 MRI, CT and PET business, and to develop mobile nuclear services. Specifically, Mr. Kancherlapalli

16 told Walder that ADM did not want to go into mobile nuclear services if it would be competing

17 against Walder as that is Walder's area of expertise.

18      5.       On or about March 14, 2006, prior to Walder's employment with ADM, Mr.

19 Kancherlapalli, the President and CEO of ADM, and Walder discussed the non-compete provision of

20 the VPS Agreement. Mr. Kancherlapalli acknowledged that the non-compete provision was not

21 enforceable in California, but indicated he would not strike the provision from the VPS Agreement

22 because it had never been stricken before for other employees. Walder was required as a condition of

23 his employment to sign the VPS Agreement containing the unenforceable non-competition provision,

24 despite ADM and Mr. Kancherlapalli's knowledge that such a provision was unlawful.

25      6.       Walder had previously been employed by Digirad, the chief competitor of ADM.

26 Because of this employment and Walder's pre-existing relationships in the medical field, Walder had

27 relationships with potential customers which could benefit ADM. Additionally, Walder had

28 relationships with other Digirad employees that ADM ultimately sought to hire away from Digirad.

7.     During the year of 2007, Walder was ordered by Mr. Kancherlapalli to terminate many of his colleagues who had also been hired from Digirad.  Walder is informed and believes and on that basis alleges that these individuals were terminated after ADM obtained access to their client list and/or utilized their client relationships with prior Digirad clients to obtain new business for ADM.  Walder is informed and believes and thereon alleges that he and his colleagues from Digirad were hired by ADM so it could access their Digirad client lists.  Walder is informed and believes and thereon alleges that such employees were later terminated once ADM had converted their client list to be serviced by ADM.

8.     Beginning in approximately September 2006, Walder received complaints from customers about the high number of false positives (a false indication of coronary artery disease) that were being generated by the cardiac studies performed by ADM.  The customer complaints increased over time after during Walder's tenure with ADM.  As a result of the complaints, Walder raised the issue with Jan Hausenbauer, Cassie Starling, and Mr. Kancherlapalli.  Specifically, Walder raised issues about the continued use of the Digirad 2020 cameras being utilized by ADM, the fact that the ADM technicians were not completing the proper tests, along with the fact that the camera heads were not functioning properly.  In response to his complaints, Walder was told to stay out of ADM's operations.

9.     Due to the concerns raised by customers, Walder met with Digirad in or about July or August 2007 regarding obtaining parts and service support for the second-hand Digirad cameras that ADM was utilizing.  Ultimately, Walder and Digirad reached an agreement that was forwarded to Mr. Kancherlapalli.  Mr. Kancherlapalli refused to enter into the agreement indicating that he did not want to deal with Digirad.  Walder expressed his concerns to Mr. Kancherlapalli that ADM was utilizing second-hand Digirad equipment that was not properly serviced and maintained.  As a result, patients undergoing cardiac testing for coronary artery disease could be harmed and the use of non-compliant equipment could constitute Medicare fraud should Medicare be billed for services.  Mr. Kancherlapalli's response was that he did not care.

10.     On or about July 24, 2007, Walder and Defendant Paul Kaplan, met with fellow employee, Michele Draper (the Operations Manager for Northern California) after hours in a

restaurant in Vacaville. During the meeting, the parties discussed the possibility of starting their own company in the future. During the course of the meeting, the parties recognized the implausibility of the idea and decided not to pursue the idea further at that time.

11.    On October 17, 2007 ADM terminated Walder's employment stating the reason for his termination as poor management style and a subpar sales record. Walder is informed and believes that the real reason for his termination was due to the fact that he had made complaints about the lack of customer satisfaction and poor quality of images which could lead to liability and/or insufficient patient care. Additionally, Walder is informed and believes that he was also terminated because ADM had converted his client list and no longer needed Walder, and so that ADM would not have to pay his outstanding commissions.

12.    Walder received his last check from ADM on October 15, 2007. The last commission statement that Walder received was in April 2007. On or about November 6, 2007, Walder sent a letter to ADM requesting his commission statements and payment of his wages. ADM refused to provide the commission statements as requested and never paid Walder his final wages or commissions as required.

13.    Because ADM failed to pay Walder his final wages and commission payments, in late December 2007, Walder instituted a claim with the California Department of Labor Standards Enforcement against ADM.

14.    On December 10, 2007, an action similar to this one was filed by ADM against Walder and Paul Kaplan in the United States District for the Northern District of Illinois under Case No. 07 C 6947.

## FIRST COUNTERCLAIM

### (Breach of Contract)

15.    Walder hereby incorporates by reference paragraphs 1 through 14 of this Counterclaim as if fully set forth herein.

16.    On or about March 14 2006, ADM and Walder entered into a written contract whereby ADM employed Walder as a Vice President of Sales. Walder agreed to sell the products and services of ADM in the Western Territory (Washington, Oregon, California, Arizona and Nevada), although

1   Walder was later told by ADM to service the entire United States.

2        17.     By selling the products and services of ADM to hospitals, multi-specialty clinics,

3   cardiology practices and other health care providers in the United States between March of 2006 and

4   the time of his termination, Walder performed all of his obligations under the contract, except for

5   those obligations from which he was excused.

6        18.     Since November 6, 2007, Walder has requested that ADM perform its obligations

7   under the Agreement by providing him his commission statements and paying him his unpaid wages.

8        19.     ADM has breached the VPS Agreement by failing to compensate Counterclaimant per

9   the terms of the VPS Agreement.  Specifically, Section 7c of the VPS Agreement states:

> If ADM terminates this agreement and VPS is not in violation of this agreement ADM will compensate the VPS at a rate which is mutually acceptable, but under no circumstances not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to VPS.  Commissions will be paid no later than 30 days after the Delivery and Acceptance date.  Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions.  Commissions on all future contract renewals will not apply.

15       20.     Additionally, ADM has breached the VPS Agreement by failing to notify Walder of the

16  customers' acceptance or rejection of contracts that Walder sold.  Section 4 of the VPS Agreement

17  states that "If ADM notifies customer of its acceptance or rejection of any contract, a copy shall be

18  transmitted to the VPS."

19       21.     Walder was not in violation of the terms of the VPS Agreement and thus was entitled

20  to compensation according to the terms of the VPS Agreement as set forth above.  Additionally,

21  according to ADM, Walder was terminated for poor management style and a subpar sales record

22  which is not a violation of the VPS Agreement.

23       22.     To the extent that ADM in fact terminated Walder for his complaints, because ADM

24  had obtained Walder's client contacts and no longer needed to employ him, and/or because Walder

25  considered starting a competing business, such actions are not wrongful and are not in violation of the

26  enforceable terms of the VPS Agreement.  Additionally, it is unconscionable to fail to pay Walder any

27  commissions after his termination.

28       23.     As a direct and proximate result of ADM's aforementioned breaches, Walder has

4

1    suffered general damages including, but not limited to, the above mentioned money damages, interest

2    and the attorneys fees, among other damages, all in an amount to be proven at trial.

3                                    **SECOND COUNTERCLAIM**

4                    **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

5            24.    Walder hereby incorporates paragraphs 1 through 23 of this Counterclaim as if fully set

6    forth herein.

7            25.    The VPS Agreement referred to above contained an implied covenant of good faith and

8    fair dealing, which obligated ADM to perform the terms and conditions of the agreement fairly and in

9    good faith and to refrain from performing any or all of the conditions of the contract that it agreed to

10   perform, or any act that would deprive Walder of the benefits of the contract.

11           26.    Walder performed all the duties and conditions of the employment agreement.

12           27.    ADM knew that Walder had fulfilled all his duties and conditions under the contract.

13           28.    ADM breached the implied covenant of good faith and fair dealing under the

14   employment agreement by terminating Walder, as outlined in these counterclaims, intentionally,

15   maliciously, and without probable cause, in bad faith and for reasons extraneous to the contract.  In

16   fact, Walder is informed and believes and on that basis alleges that ADM has a history of terminating

17   employees once they converted the employee's client contacts to be serviced by ADM.

18           29.    ADM further breached the implied covenant of good faith and fair dealing by depriving

19   Walder of the commissions he was due at the time of his resignation.

20           30.    As a direct and proximate result of ADM's aforementioned breaches, Walder has

21   suffered general damages including, but not limited to, the above mentioned money damages, interest

22   and the attorneys fees, among other damages, all in an amount to be proven at trial.

23                                    **THIRD COUNTERCLAIM**

24                                        **(Accounting)**

25           31.    Walder hereby incorporates paragraphs 1 through 30 of this Counterclaim as if fully set

26   forth herein.

27           32.    On or about March 14 2006, ADM and Walder entered into a written contract whereby

28   ADM employed Walder as a Vice President of Sales.  Walder agreed to sell the products and services

                                            5                          07cv2401 W (CAB)

1   of ADM in the Western Territory (Washington, Oregon, California, Arizona and Nevada).

2       33.    The VPS Agreement between ADM and Walder set forth compensation and

3   commission rates that governed Walder's compensation and commission payments. Specifically,

4   Walder's compensation and commission rates are set forth on pages 5 through 7 of the VPS

5   Agreement. Additionally, Section 4 of the VPS Agreement states that "If ADM notifies customer of

6   its acceptance or rejection of any contract, a copy shall be transmitted to the VPS."

7       34.    Pursuant to the contract, Walder entered into the employment and diligently and

8   faithfully rendered his services to ADM and performed all of the terms and conditions of the contract

9   on his part to be performed.

10      35.    As of April 2007, ADM ceased providing commission statements to Walder.

11  Throughout Walder's employment, he was never provided the notices of acceptance or rejection of the

12  contracts he sold as was required under the VPS Agreement. Walder was terminated on October 17,

13  2007, allegedly for poor management style and a subpar sales record.

14      36.    On November 6, 2007, Walder specifically asked ADM to provide him with his

15  commission statements, and to pay him his unpaid wages and commissions.

16      37.    ADM has refused to provide the requested statements, nor has it provided Walder with

17  his unpaid wages.

18      38.    Walder is informed and believes and thereon alleges that between March 2006 and

19  October 2007, Walder entered into sales transactions with various persons for which ADM received a

20  profit, a portion of which is due and owing to Walder as commissions. ADM, however, has not

21  accounted for some or all of the profits and has not paid Walder some or all of his share.

22      39.    Walder does not know the precise amount of profit on which to base his claim for

23  compensation, because such profits can only be determined by an accounting of ADM's books and

24  records. Walder is informed and believes and thereon alleges that ADM owes Walder commission

25  compensation in excess of $70,000.

26  ///

27  ///

28  ///

# FOURTH COUNTERCLAIM

## (Wrongful Termination In Violation of Public Policy)

40.     Walder hereby incorporates paragraphs 1 through 39 of this Counterclaim as if fully set forth herein.

41.     Between March 21, 2006 and October 17, 2007 Walder was employed by ADM as a Vice President of Sales.

42.     On October 17, 2007, Walder was terminated by ADM allegedly for poor management style and a subpar sales record.

43.     Walder is informed and believes and thereon alleges that the real reason for his termination was due to the complaints he made to ADM regarding as alleged above, the fact that ADM had converted his clients, and in order to avoid paying Walder his earned but unpaid commissions.

44.     Such actions are in violation of public policy. Specifically, California Labor Code sections 201 and 202 set for the public policy of the State of California regarding the prompt payment of wages to employees. Additionally, there is a strong public policy regarding providing proper medical care to patients and properly billing Medicare for services performed.

45.     Medicare has established specific requirements, in order to be reimbursed, for the clinical testing of patients. Under the rubric of clinical responsibilities, the physician user is responsible for the verification of the proper operation of the equipment. Medicare states that the equipment must pass the manufacturers specifications. ADM failed to properly test the equipment prior to use and intentionally misrepresented the cameras condition to the physician user. ADM's willful, knowing and intentional usage of the equipment endangered the patient's lives and subjected its physician customers to liability. Such conduct violates 42 USC 1320c-5(a)(1), among other statutes and regulations governing Medicare.

46.     As a proximate result of ADM's willful, knowing and intentional conduct, Walder has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, all to his damage in an amount to be established at trial.

47.     ADM's conduct as described above was committed maliciously, fraudulently and

1   oppressively with the wrongful intention of injuring Walder, from an improper and evil motive

2   amounting to malice, and in conscious disregard of the rights of Walder.  Such conduct was also

3   authorized and/or ratified by the owners, officers, directors or managing agents of ADM.  In light of

4   ADM's willful, knowing, and intentional discrimination against him, Walder seeks and award of

5   punitive and exemplary damages in an amount according to proof.

6                                **FIFTH COUNTERCLAIM**

7                                **(Fraud - Misrepresentation)**

8           48.    Walder hereby incorporates paragraphs 1 through 47 of this Counterclaim as if fully set

9   forth herein.

10          49.    In or about late February 2006, ADM, through Mr. Kancherlapalli, contacted Walder

11  regarding employment with ADM.  Mr. Kancherlapalli represented to Walder that ADM desired to

12  employ him because it wanted to improve its sales of nuclear fixed sites, expand its sales in its MRI,

13  CT and PET business, and to develop mobile nuclear services.  Specifically, Mr. Kancherlapalli told

14  Walder that ADM did not want to go into mobile nuclear services if it would be competing against

15  Walder as that is Walder's area of expertise.  Mr. Kancherlapalli was aware that Walder had another

16  job offer at the time from another employer.

17          50.    ADM knew or should have known at the time this representation was made that it was

18  false, in that it actually sought to obtain Walder's client list and then terminate him.

19          51.    The misrepresentation was made with the intent to induce Walder to enter into the VPS

20  Agreement with ADM and to induce Walder forgo another job offer Walder had been given.

21          52.    Walder's reliance on that misrepresentation was reasonable, in that he believed he was

22  being given a legitimate job offer.

23          53.    As a result of Walder's reliance on the misrepresentation, he suffered damages in that

24  he gave up another job, to his ultimate detriment in that he now is unemployed and does not have the

25  wages and benefits from his previous job and is currently unable to find new employment due to

26  ADM's actions.

27          54.    As a proximate result of ADM's willful, knowing and intentional conduct, Walder has

28  suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment,

1 | and mental anguish, all to his damage in an amount to be established at trial.

2 | 55.    ADM's conduct as described above was committed maliciously, fraudulently and

3 | oppressively with the wrongful intention of injuring Walder, from an improper and evil motive

4 | amounting to malice, and in conscious disregard of the rights of Walder.  Such conduct was also

5 | authorized and/or ratified by the owners, officers, directors or managing agents of ADM.  In light of

6 | ADM's willful, knowing, and intentional discrimination against him, Walder seeks and award of

7 | punitive and exemplary damages in an amount according to proof.

8 | ### SIXTH COUNTERCLAIM

9 | **(Defamation *per se*)**

10 | 56.    Walder hereby incorporates paragraphs 1 through 55 of this Counterclaim as if fully set

11 | forth herein.

12 | 57.    Walder is informed and believes and thereon alleges that ADM employee, Michele

13 | Draper, has on numerous occasions stated that Walder is being and has been paid illegal sums of

14 | money for various services and that he, as a result of his actions was terminated and will be

15 | incarcerated.  Walder is informed and believes and thereon alleges that these statements were made to

16 | multiple physicians, nurses and office staff, with which Walder has relations with for numerous years.

17 | 58.    Michele Draper is an agent of ADM and in making the statements alleged herein was

18 | acting within the course and scope of such agency and employment.  Walder is informed and believes

19 | and thereon alleges that Ms. Draper made these statements in an attempt to deflect attention from

20 | customer's complaints about ADM's equipment and services.

21 | 59.    These statements are false.  Such statements have directly injured Walder with respect

22 | to his profession, trade and business by imputing to him the general disqualification in those respects

23 | which the occupation requires and because the statements charge him with a crime.

24 | 60.    Such statements are slanderous on their face.  They clearly expose Walder to hatred,

25 | contempt, ridicule and obloquy because the statements charge plaintiff with having committed and

26 | have been convicted of the crime of embezzlement.

27 | 61.    As a proximate result of the above-described publication, Walder has suffered loss of

28 | his reputation, shame, mortification and injury to his feelings and reputation, all to his damage in an

1    amount to be established by proof at trial.

2        62.    The above-described publication was not privileged because it was published by ADM

3    through their employee with malice, hatred and ill will toward Walder and the desire to injure him.

4    Because of such malice, Walder seeks punitive damages in an amount to be established by proof at

5    trial.

6        63.    Walder has suffered damages in that his professional reputation has been damaged, to

7    his ultimate financial detriment.  Walder has suffered harm, including lost future earnings and other

8    employment benefits, and mental anguish, all to his damage in an amount to be established at trial.

9                                **SEVENTH COUNTERCLAIM**

10                       **(Violation of California Labor Code section 226(a))**

11        64.    Walder hereby incorporates paragraphs 1 through 63 of this Counterclaim as if fully set

12    forth herein.

13        65.    ADM has intentionally and willfully failed to provide its California employees with

14    complete and accurate wage statements that include, among other things, the applicable hourly rates in

15    effect during the pay period, the corresponding number of hours worked at each hourly rate by the

16    employee, and withholding amounts on commission checks.

17        66.    As a result of ADM's violation of California Labor Code section 226(a), Walder and

18    other California employees have suffered injury and damage to their statutorily-protected rights.

19        67.    Specifically, Walder and other California employees are aggrieved and have been

20    injured by ADM's intentional violation of California Labor Code section 226(a) because they were

21    denied both their legal right to receive, and their protected interest in receiving, accurate, itemized

22    wage statements pursuant to California Labor Code section 226(a).

23        68.    Walder is entitled to recover from ADM the greater of his actual damages caused by

24    ADM's failure to comply with California Labor Code section 226(a), or an aggregate penalty not

25    exceeding $4000 pursuant to Labor Code section 226(e).  Additionally, Walder is entitled to recover

26    any other penalties allowable by law.

27    ///

28    ///

## EIGHTH COUNTERCLAIM

### (Violation of California Labor Code sections 96(k) and 98.6)

69.    Walder hereby incorporates paragraphs 1 through 68 of this Counterclaim as if fully set forth herein.

70.    California Labor Code sections 98.6 and 96(k) prohibit an employer from discriminating against an employee for engaging in lawful conduct that occurs during nonworking hours, away from the employer's premises.

71.    To the extent ADM has failed to pay Walder his commissions due to his investigation into starting another business, ADM has damaged Walder.

72.    Walder is entitled to recover his due, but unpaid, commissions from ADM. Additionally, Walder is entitled to reimbursement of his lost wages which are attributable to ADM's actions.

73.    Additionally, Walder is entitled to recover all penalties and remedies available for violations of California Labor Code sections 96(k) and 98.6.

## NINTH COUNTERCLAIM

### (Violation of California Labor Code section 432.5)

74.    Walder hereby incorporates paragraphs 1 through 73 of this Counterclaim as if fully set forth herein.

75.    California Labor Code section 432.5 prohibits an employer, agent, or officer of an employer from requiring an employee or applicant for employment to agree, in writing, to any term or condition which is known by such employer, agent or officer of an employer to be prohibited by law.

76.    ADM's VPS Agreement contains a non-competition provision which is in violation of California Business and Professions Code section 16600. Mr. Kancherlapalli acknowledged that the non-compete provision was not enforceable in California, but indicated he would not strike the provision from the VPS Agreement because it had never been stricken before for other employees. Walder was required as a condition of his employment to sign the VPS Agreement containing the unenforceable non-competition provision, despite ADM and Mr. Kancherlapalli's knowledge that such a provision was unlawful.

77.    ADM's conduct as described above was committed maliciously, fraudulently and oppressively with the wrongful intention of injuring Walder, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Walder.  Such conduct was also authorized and/or ratified by the owners, officers, directors or managing agents of ADM.  In light of ADM's willful, knowing, and intentional conduct, Walder seeks and award of punitive and exemplary damages in an amount according to proof.

78.    Additionally, Walder is entitled to recover all penalties and remedies available for violations of California Labor Code section 432.5.

**WHEREFORE** Walder prays judgment against ADM as follows:

**On the First Counterclaim:**

1.    For compensatory damages in an amount sufficient to fully compensate Walder;

2.    For interest from the date of Walder's termination;

3.    For reasonable attorney's fees pursuant to the terms of the VPS Agreement and/or Labor Code section 218.5;

4.    For costs of suit; and

5.    For such other and further relief the court may deem proper.

**On the Second Counterclaim:**

1.    For compensatory damages in an amount sufficient to fully compensate Walder;

2.    For interest from the date of Walder's termination;

3.    For reasonable attorney's fees pursuant to the terms of the VPS Agreement and/or Labor Code section 218.5;

4.    For costs of suit; and

5.    For such other and further relief the court may deem proper.

**On the Third Counterclaim:**

1.    For an accounting from ADM to Walder;

2.    For payment to Walder of the amount due from ADM as a result of the account and interest on that amount from and after October 17, 2007;

3.    For reasonable attorney's fees, as provided in the VPS Agreement; and

1    4.    For such other and further relief the court may deem proper.

2    **On the Fourth Counterclaim:**

3    1.    For general damages in amounts according to proof;

4    2.    For special damages in amounts according to proof;

5    3.    For punitive damages in an amount sufficient to punish and make an example out of

6    ADM;

7    4.    For pre-judgment interest as provided by law; and

8    5.    For such other and further relief the court may deem proper.

9    **On the Fifth Counterclaim:**

10    1.    For general damages in amounts according to proof;

11    2.    For special damages in amounts according to proof;

12    3.    For punitive damages in an amount sufficient to punish and make an example out of

13    ADM;

14    4.    For pre-judgment interest as provided by law; and

15    5.    For such other and further relief the court may deem proper.

16    **On the Sixth Counterclaim:**

17    1.    For general damages in amounts according to proof;

18    2.    For special damages in amounts according to proof;

19    3.    For punitive damages in an amount sufficient to punish and make an example out of

20    ADM;

21    4.    For pre-judgment interest as provided by law; and

22    5.    For such other and further relief the court may deem proper.

23    **On the Seventh Counterclaim:**

24    1.    For actual, consequential and incidental losses and damages, according to proof;

25    2.    For statutory penalties pursuant to California Labor Code section 226(e);

26    3.    For reasonable attorneys' fees and costs of suit incurred herein, pursuant to California

27    Labor Code section 226(e); and

28    4.    For such other and further relief the court may deem proper.

**On the Eighth Counterclaim:**

1.    For actual, consequential and incidental losses and damages, according to proof;

2.    For penalties according to proof; and

3.    For such other and further relief the court may deem proper.

**On the Ninth Counterclaim:**

1.    For actual, consequential and incidental losses and damages, according to proof;

2.    For penalties according to proof;

3.    For punitive damages in an amount sufficient to punish and make an example out of ADM; and

4.    For such other and further relief the court may deem proper.

**On All Counterclaims:**

1.    For cost of suit incurred herein;

2.    For prejudgment interest at the legal rate; and

3.    For such other relief as the Court may deem proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Walder hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: February 15, 2008              Respectfully submitted,

LUCE, FORWARD, HAMILTON & SCRIPPS LLP


By: <u>s/Liseanne R. Kelly</u>
Liseanne R. Kelly
Attorneys for Defendant ROBERT WALDER
email: Lkelly@luce.com

101069419.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibits

Table of Contents

Pages

Exhibit "A"
Vice President of Sales Agreement                                                        17-23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit "A"

## Vice President of Sales Agreement

This agreement made this 21st day of March, 2006 by and between Bob Walder hereinafter referred to as the Vice President of Sales "**VPS**" and **American Diagnostic Medicine, Inc.**, a corporation under the laws of the State of Illinois, having its office at 960 Industrial Drive, Suite 7, Elmhurst, Illinois 60126, hereinafter referred to as "**ADM**", is as follows:

**1.     APPOINTMENT AND ACCEPTANCE:** ADM appoints VPS as its Vice President of Sales to sell the products and services of ADM in the territories and accounts or customers as set forth below and VPS accepts the appointment and agrees to exclusively sell and promote the sale of ADM's products and services.

**2.     TERRITORY:** VPS's territories and/or accounts shall consist of the following:

All Hospitals, Multi-Specialty Clinics, Cardiology Practices and other Health Care Providers in the following geographic locations:

Western Territory including Washington, Oregon, California, Arizona, Nevada.

**3.     COMPENSATION:** VPS compensation for services performed under the terms of this agreement shall be for the sale of certain medical diagnostic imaging equipment, whether through operating leases, joint ventures, traditional capital leases or outright purchases or other types of services supplied under the terms of this agreement. Please refer to **EXHIBIT A** for detailed information concerning compensation.

    **a.**     It is the responsibility of the VPS to obtain advanced authorization from ADM on all special circumstances involving compensation not covered by this Agreement.     Any special arrangements, which are agreed upon, by ADM and the VPS must be communicated in writing.
    **b.**     Sales efforts and in turn commissions due on all new accounts will be governed by the territories applicable to this agreement if the decision making / buying power resides within the territory for each specific customer and/or account.
    **c.**     The commission shall be paid to the VPS based on the schedule shown in **EXHIBIT A.** Commission checks shall be paid on a 1099 form to VPS.
    **d.**     ADM shall pay for or reimburse VPS for all travel costs relating to obtaining business under the terms of this Agreement. Such travel costs may include, transportation (airfare, rental cars), mileage reimbursement, lodging, entertainment, phone calls, etc.). VPS shall provide to ADM at its principal office detailed expense reports on ADM expense report forms. Each expense report shall detail the reason for travel and well as who was visited.     Expense reports turned in after thirty (30) days shall not be eligible for reimbursement.     All travel arrangements and costs must comply with ADM travel policies and be pre-approved by ADM.

**4.     ACCEPTANCE OF CONTRACTS:** All contracts are subject to acceptance or rejection by an authorized officer of ADM.   ADM shall be responsible for all credit risks and collections.   If ADM notifies customer of its acceptance or rejection of any contact, a copy shall be transmitted to the VPS.

**5.     TERMS OF SALE:** ADM shall provide VPS with a current price schedule / quotation, which shall be subject to change upon ninety (90) days notice.   Representative may quote to prospective customers from this price list provided but no quote shall be valid for more than ninety (90) days. All other sales shall be at prices and upon terms established by ADM. ADM shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend prices and other terms and conditions of sale. VPS shall not accept orders in ADM's name and shall not make price quotations or delivery promises for items not specifically on the current price

# Exhibit "A"

# Page 17

list, without ADM's approval.

**6.    VPS'S RELATIONSHIP & CONDUCT OF BUSINESS:** VPS shall maintain its own sales organization within its assigned territories and shall use its best efforts and devote such time as may be necessary to sell and promote the sale of ADM's products and services and perform reasonable after-sale and follow-up functions as well as a liaison between ADM and customers within the territory. VPS agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

   **a.**    Specific obligations of the VPS will include: Sales Lead Generation, Phone Solicitation, Written Sales Quotations, Contracts and Contract Negotiations, Sales Presentations, Trade Show Attendance and follow-up to potential customers.
   **b.**    Any sales lead generated by VPS must immediately (within twenty-four hours) be conveyed via e-mail to the Sales Administrator.  Follow-up calls, correspondences or sales quotes by the VPS must immediately (within twenty-four hours) conveyed via e-mail to the Sales Administrator. Weekly activity reports must be e-mailed no latter than 4:00 PM CST every Friday (No exception for holidays).  Monthly forecast and outlooks must be e-mailed no later than 4:00 PM CST on the last business day of every month (No exception for holidays).
   **c.**    VPS shall conduct all of his business in a professional manner in ADM's name and dress professionally and well groomed.
   **d.**    The VPS shall not, without ADM's prior approval, alter, enlarge, or limit orders, make representations, guarantees concerning ADM's product and services or accept the return of, or make any allowances for such products and services whether written or orally.

**7.    TERMINATION:** This agreement shall be enforce until canceled.  Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail.  Upon termination of this agreement the following applies;

   **a.**    Any violation of the terms of this agreement shall be grounds for immediate termination and VPS shall not be eligible for any commissions owed on confirmed or pending contracts.
   **b.**    If VPS elects to terminate this agreement and is not in violation of any of the terms of this agreement, ADM will compensate VPS for signed contracts not yet accepted at our own discretion. Electing to terminate this agreement, does not obligate ADM to make any further commission payments.
   **c.**    If ADM terminates this agreement and VPS is not in violation of this agreement ADM will compensate the VPS at a rate which is mutually acceptable, but under no circumstance not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to VPS.  Commissions will be paid no later than 30 days after the Delivery and Acceptance date. Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions. Commissions on all future contract renewals will not apply.

**8.    NON-DISCLOSURE:** WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States. And, WHEREAS ADM under this agreement wishes to protect this information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information.  NOW THEREFORE, the signatories mutually covenant and agree as follows:

   **a.**    Definition of Proprietary Information.
   For purposes of this Agreement, the term "Proprietary Information" shall mean all of the information, data and software furnished by ADM to VPS, whether in oral, written, graphic or machine-readable form, which may include but not be limited to names of other entities interested in acquiring an ownership interest in ADM, financial statements, corporate and stock

# Exhibit "A"

# Page 18

Information, file layouts, marketing strategies, business, product or acquisition plans, current business relationships or strategies and customer lists. "Proprietary Information" shall not include information which: (i) may be publicly disclosed by the party disclosing the information either prior to or subsequent to the receipt of such information by the receiving party; (ii) shall become generally known in the trade through no fault of the receiving party; (iii) may be lawfully disclosed to the receiving party by a third person to this Agreement who has lawfully acquired the Proprietary Information (iv) was independently developed by the receiving party; or (v) is required to be disclosed pursuant to a duly authorized subpoena, court order, or government authority, in which event the receiving party shall provide prompt written notice to the disclosing party prior to such disclosure, so that the disclosing party may seek a protective order or other appropriate remedy. In any event, the receiving party hereby acknowledges and agrees that, if such party shall seek to disclose, divulge, reveal, report, publish, transfer or use, for any purpose whatsoever, any Proprietary Information, such party shall bear the burden of proving that any such information is subject to one of the exceptions identified herein.

**b.** Treatment of Information.

VPS acknowledges that, in and as a result of employment, and/or discussions with ADM's agents, vendors, officers and employees, VPS shall or may be making use of or acquiring Proprietary Information. As a material inducement to disclose such Proprietary Information, VPS covenants and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee: (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest. Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

**c.** Ownership of Information.

VPS covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

**d.** Injunctive Relief.

VPS understands and agrees that ADM shall suffer irreparable harm in the event of a breach of any obligations under this Agreement and the monetary damages shall be inadequate to compensate ADM for such breach. Accordingly, VPS agrees that, in the event of a breach or threatened breach of any of the provisions of this Agreement, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, ADM shall be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach.

**e.** Materials.

All notes, data, tapes, reference items, sketches, drawings, memoranda, manuals, documentation, records and other materials in any way relating to any of the Proprietary Information or to ADM's business shall belong exclusively to ADM and VPS to turn over all copies of such materials and any Proprietary Information in the VPS's possession or control at the request of ADM.

**f.** Nature of the Information.

Although the Proprietary Information contains information which is relevant for day-to-day operation of the company, ADM makes no representations or warranties, express or implied, as to the accuracy or completeness of the Proprietary Information. ADM shall not have any liability to the other party relating to or arising from the use of the Proprietary Information according to the terms of this Agreement. Neither party represents or warrants that Proprietary Information disclosed hereunder will not infringe any third party's patents, copyrights, trade secrets or other proprietary rights of others.

**g.** Reasonableness of Restrictions; Severability.

EACH PARTY HAS CAREFULLY READ AND CONSIDERED THE PROVISIONS OF THIS SECTION HEREOF INCLUSIVE AND HAVING DONE SO, AGREES THAT THE RESTRICTIONS SET FORTH IN SUCH ARTICLES ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF THE PARTIES AND ITS BUSINESS, OFFICERS, DIRECTORS

# Exhibit "A"

# Page 19

AND EMPLOYEES. Each party further agrees that the restrictions set forth in this Agreement shall not impair either party's ability to do business within field or fields of its choice including, without limitation, those areas in which such party is, to be or has done business. The provisions of this Agreement shall be deemed severable, and invalidity or unenforceability of any one or more of the provisions hereof shall not affect the validity and enforceability of the other provisions hereof.

**9.    NOT COMPETE:** For good consideration and as an inducement for ADM to employ VPS, VPS hereby agrees not to directly or indirectly compete with the business of ADM and its successors and assigns during the period of employment and for a period of 1 year following the termination of VPS and notwithstanding the cause or reason for termination. The term "not compete" as used herein shall mean that VPS shall not own, manage, operate, consult or to be employee in a business substantially similar to or competitive with the present business of ADM or such other business activity in which ADM may substantially engage during the term of employment.

**10.  SETTLEMENT OF DISPUTES:** The parties agree that any disputes or questions arising hereunder including the construction or application of this agreement may be settled by arbitration in accordance with the rules of the American Arbitration Association then enforce. The American Arbitration Association shall name a panel of five arbitrators and ADM shall then strike two names and the remaining names shall be the arbitrator. The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact and shall not be appealable to any court in any jurisdiction. Both parties shall share the expenses of the arbitrator equally unless the arbitrator determines that the expenses shall be otherwise assessed. The prevailing party in any lawsuit shall recover reasonable attorney fees and costs incurred from each other.

**11.  GENERAL:** This agreement contains the entire understanding of the parties, and shall supersede any other oral or written agreement and shall insure to the benefit of ADM or any of its successors and assigns. This agreement may not be modified in any way without consent of both parties. Nothing in the agreement shall be construed to constitute the VPS as the partner of ADM nor shall either party have any authority to bind the other in any respect; it being intended that each shall remain an independent contractor responsible for only its own actions.

**12.  CONSTRUCTION OF AGREEMENT:** This agreement shall be construed according to the laws of the state of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first written in multiple counterparts, each of which shall be considered an original.

ADM:                                                  VPS: Vice President of Sales

**American Diagnostic Medicine, Inc.**               _____

Printed Name:_____               Signature:_____

Signature:_____

Title:_____

# Exhibit "A"

# Page 20

# EXHIBIT A
*Compensation & Commission Rates*

**VPS Compensation:**
ADM shall pay VPS a base, annually salary of $132,000.00 to be paid bi-monthly on the 1st and 15th of each calendar month.

**Employee Benefits:**
- Health Insurance & Drug Prescription
- Dental Insurance
- Retirement Fund – Company 401(k), non-matching
- Short Term & Long-Term Disability
- Life Insurance
  (Please contact Janet Hausenbauer at 800.262.9645, ext. 109 for additional details of benefits & cost)

**Paid Vacation:**
- Two (2) weeks paid vacation after the first 12 months of employment
- Three (3) weeks paid vacation after 5 years of employment
- Four (4) weeks paid vacation after 10 years of employment
- Paid Holidays including New Years Day, Memorial Day, Labor Day, July 4th, Thanksgiving Day and Christmas Day.
- Each Employee receives 3 sick days and 2 personal days per year

**Other Incentives:**
- Car allowance of $500.00 monthly to be paid bi-monthly on the same schedule as VPS compensation listed above.

### Fee- per-Exam Operating Leases
### Fixed Site Commission Schedule

**Commissions paid on new nuclear fixed site accounts:**

| | |
|---|---|
| 60 month contract w/ minimums | 10,000 |
| 48 month contract w/ minimums | 8,000 |
| 36 month contract w/ minimums | 6,000 |
| 24 month contract | 4,000 |
| 12 month contract | 2,000 |

**Commissions paid on new 64-slice CT fixed site accounts (50% until September 30, 2006, 100% thereafter):**

| | |
|---|---|
| 60 month contract w/ minimums | 15,000 |
| 48 month contract w/ minimums | 12,000 |

**Commissions paid to vice president of sales on fixed site contract by sales rep (paid upon D&A):**

| | |
|---|---|
| 60 month w/minimums | 1,000 |
| 48 month w/ minimums | 800 |
| 36 month contract | 600 |
| 24 month contract | 400 |
| 12 month contract | 200 |

# Exhibit "A"

# Page 21

## EXHIBIT A
### Compensation & Commission Rates

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.

The commissions will be paid to the TSR based on the following payment schedule:
- 25% paid upon signed contract and credit approval
- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.
- 25% paid in the pay period after 2 full scanning months and based on the following criteria
  1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
  2. Patient volume at 75-99% will receive 75% of back end commission
  3. Patient volume at 100-124% will receive the full back end commission
  4. Patient volume 125-150% will receive 125% of back end commission
  5. Patient volume at >150% will receive 150% of back end commission

### Fee- per-Exam Operating Leases
### Mobile Commission Schedule

**Commissions paid on new mobile accounts:**
| | |
|---|---|
| 12 month contract w/ 4 days/month | 4,000 |
| 12 month contract w/ 3 days/month | 3,200 |
| 12 month contract w/ 2 days/month | 2,000 |
| 12 month contract w/ 1 day/month | 800 |

**Commissions paid to vice president of sales on new mobile contract by sales rep (paid upon D&A):**
| | |
|---|---|
| 12 month contract w/ 4 days/month | 500 |
| 12 month contract w/ 3 days/month | 375 |
| 12 month contract w/ 2 days/month | 250 |
| 12 month contract w/ 1 day/month | 125 |

**Commissions paid on renewed mobile accounts:**
| | |
|---|---|
| 12 month contract w/ 4 days/month | 2,000 |
| 12 month contract w/ 3 days/month | 1,600 |
| 12 month contract w/ 2 days/month | 1,000 |
| 12 month contract w/ 1 day/month | 400 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.

The commissions will be paid to the TSR based on the following payment schedule:
- 50% paid upon signed signed contract and credit approval

# Exhibit "A"

# Page 22

· 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the VPS.*

**AGREED AND ACCEPTED:**                    **AGREED AND ACCEPTED:**

ADM                                         VPS     Bob Walder

Signature:_____         Signature:_____

# Exhibit "A"

# Page 23

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2008, at San Diego, California, I caused a copy of the

foregoing document to be served upon all counsel of record via CM/ECF as follows:

Keith Edward Butler, Esq.
CLAUSEN MILLER PC
2040 Main Street
Suite 500
Irvine, CA  92614
Email: kbutler@clausen.com

Joshua A. Aldort
CLAUSEN MILLER PC
10 South LaSalle Street
Chicago, IL 60603
Email: jaldort@clausen.com

Frederick Wilson Gaston, Esq.
RILEY HURWITZ AND GASTON
222 Ash Street
San Diego, CA  92101
Email: fg@sandiegolegal.us

B. M. STREVELER